UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

**National Labor Relations Board,**

    Applicant,

v.

**Fortune Bay Resort Casino,**

    Respondent.

Civil No. 08-mc-00065 (JRT/JJG)

**REPORT AND RECOMMENDATION**

---

JEANNE J. GRAHAM, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge on the National Labor Relations Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum. (Docket No. 1.) The National Labor Relations Board is represented by Joseph H. Bornong. Fortune Bay Resort Casino is represented by Henry M. Buffalo, Jr., Jessica Intermill, Joseph F. Halloran, Mark A. Anderson, and William A. Szotkowski. For the reasons discussed below, the undersigned recommends that the application be granted and the subpoena duces tecum be enforced.[1]

## I. BACKGROUND

Respondent Fortune Bay Resort Casino ("Respondent") is a wholly-owned and managed governmental entity of the Bois Forte Band of Chippewa Indians ("Band"), a federally-recognized Indian tribe. (Resp't's Resp. to Order to Show Cause at 18; Docket No. 7.)

---

[1] In its memorandum in support of its application, the Board requested that a District Judge rather than a Magistrate Judge directly rule on its application. (Board's Mem. Supp.; Docket No. 2 at 10–11.) Although the undersigned has authority to decide subpoena enforcement issues in accordance with 28 U.S.C. § 636(b)(1)(A), the Court will recommend the disposition of this matter in a Report and Recommendation to alleviate the Board's concern.

Respondent operates a hotel, resort, and casino on the Band's Lake Vermilion Reservation under a tribal gaming ordinance and license issued by the Bois Forte Reservation Tribal Council. (*Id.* at 3.) Respondent employs both Band members as well as nonmembers. (Board's Mem. Supp. at 3; Docket No. 2.) Specifically, Respondent employs approximately 450 people, one-third of whom are Native American; and of the Native Americans employed, eighty-two percent are Band members. (Resp't's Resp. to Order to Show Cause at 19; Docket No. 7.) Respondent's customer base consists of both Band members and nonmembers. (Board's Mem. Supp. at 3; Docket No. 2.)

In 2007, the United Steelworkers Union ("Union") began efforts to organize Respondent's employees, and those efforts are ongoing. (*Id.*) On or about August 4, 2008, Respondent terminated Rorie Farr, a Band member, for allegedly failing to show up for work as scheduled without giving advance notice as required by Respondent's personnel policy. (*Id.*) According to the National Labor Relations Board ("Board"), Farr orally appealed her discharge to the Band's Tribal Chairman, and on August 18, the Union filed an unfair labor practice charge alleging that Farr's termination was motivated by the Union's organizing activities. (*Id.* at 4; Resp't's Resp. to Order to Show Cause at 4; Docket No. 7.)[2] The Tribal Chairman then told Farr she was rehired, but Respondent's CEO withdrew the reinstatement offer. (*See* Board's Mem. Supp. at 4; Docket No. 2.) The Union subsequently filed a charge against Respondent on October 14, 2008, alleging in relevant part that Respondent violated section 8(a)(1), (3), and (4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, by refusing to reinstate Farr in retaliation for her having participated in a previous Board case and for engaging in union and protected concerted activities. (*Id.* at 1.)

---

[2] The Union later withdrew this charge on October 9, 2008. (Board's Mem. Supp.; Docket No. 2 at 4 n.1.)

Pursuant to congressional authority, the Board, by its General Counsel, has the authority to conduct unfair labor practice investigations upon the filing of a charge. 29 U.S.C. §§ 153(d), 159(c)(1), 160(a). When the Union filed its charge in October 2008, the General Counsel commenced an investigation to determine whether Respondent had engaged in any unfair labor practices, in accordance with section 10(a) of the NLRA, 29 U.S.C. § 160(a), and section 102.15 of the Board's Rules. (Application at 2, ¶ 3; Docket No. 1.)

The Board issued and served a subpoena duces tecum on Respondent on October 31, 2008, directing Respondent to appear before an agent of the Board on November 13, 2008, and to produce certain subpoenaed documents. (*Id*. ¶ 4.) The subpoena "seeks information relevant to Respondent's effects on commerce, to establish federal jurisdiction, and to attributes of tribal sovereignty, to establish whether the Board will consider Respondent an 'employer' within the meaning of the NLRA." (Application Ex. 2; Docket No. 1-2.) Respondent objected to the subpoena. (Board's Mem. Supp. at 4; Docket No. 2 (citing Anderson Letter, Ex. 3; Docket No. 1-2).) The Board then applied in federal court for an order requiring enforcement of the subpoena, pursuant to section 11(2) of the NLRA. (Application; Docket No. 1.)

On January 6, 2009, the undersigned ordered Respondent to show cause within thirty days of the Order why the subpoena should not be enforced. Respondent filed its response on February 5, 2009 (Docket No. 7), followed by the Board's reply on February 26, 2009 (Docket No. 9), and the Respondent's surreply on April 2, 2009. (Docket No. 13.)

## II.     DISCUSSION

Deciding whether the subpoena should be enforced requires resolution of four issues: (1) whether Respondent possesses tribal sovereign immunity from suits brought by the United States; (2) whether the Board's subpoena enforcement action is brought by the United States;

(3) whether the Court has jurisdiction over this matter; and (4) ultimately, whether the subpoena should be enforced. The first three issues may be quickly resolved, but the fourth issue presents a more complicated question.

### A. Sovereign Immunity

The first issue is whether sovereign immunity protects Respondent from suits brought by the United States.[3] As Respondent concedes, tribal sovereign immunity is not absolute against the federal government. *See United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382 (8th Cir. 1987); *see also Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459 (9th Cir. 1994) ("[T]ribal sovereignty does not extend to prevent the federal government from exercising its superior sovereign powers."). Indeed, Respondent further concedes that it "is not immune from this instant enforcement proceeding because it was brought by the Board as an agent of the United States." (Resp't's Resp. to Order to Show Cause at 9; Docket No. 7.) Given this concession, the Court turns to the question of whether the Board's subpoena enforcement action constitutes an action brought by the United States.

### B. An Action Brought by the United States

This subpoena enforcement action has stemmed from the General Counsel's initial request that the Board, as an administrative agency of the U.S. Government, issue a subpoena duces tecum to Respondent. (Application at 1; Docket No. 1.) Despite Respondent conceding that it is not immune from the enforcement action "because it was brought by an agent of the

---

[3] Respondent could have tribal sovereign immunity as a tribal corporate entity under the Indian Reorganization Act of 1934, 25 U.S.C. § 477, but there is no need to decide this question. As Respondent notes in its response, the Band is one of six bands of the Minnesota Chippewa Tribe ("MCT"). The Secretary of the Interior issued a corporate charter to the MCT on September 17, 1937, but Congress later revoked the charter in 1996. Pub. L. No. 104-109, § 13, 110 Stat. 763, 765 (codified at 25 U.S.C. § 983c). Thus, "the Band now operates all of its business activities directly—not through a federally or tribally chartered entity." (Resp't's Resp. to Order to Show Cause; Docket No. 7 at 3.)

United States, to enforce its federal subpoena power," it nevertheless claims sovereign immunity because the Board "seeks enforcement of a subpoena issued in an underlying action—one brought by a private party." (Resp't's Resp. to Order to Show Cause at 7-8; Docket No. 7.)

Some jurisdictions have reasoned that service of a federal subpoena upon an employee of a tribal entity is neither a suit, nor an action against a tribe. *See, e.g.*, *United States v. Juvenile Male 1*, 431 F. Supp. 2d 1012, 1016 (D. Ariz. 2006). The court in *Juvenile Male 1* held that the Navajo Tribe's sovereign immunity did not preclude enforcement of a subpoena duces tecum issued by the district court against employees of tribal entities, inasmuch as service of the subpoena was not a suit against the tribe, and tribal immunity had no application to claims by the United States. *Id.* at 1016–17. The court explained:

> The service of a federal subpoena on an employee of an entity of a tribe is neither a suit, nor one against a tribe. . . . But it can hardly be contended that federal or state sovereign immunity from suit has any application to the enforcement of a federal subpoena on the custodian of records of a state or federal agency. Federal subpoenas routinely issue to state and federal employees to produce official records or appear and testify in court and are fully enforceable despite any claim of immunity.

*Id.* (citing *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778 (9th Cir. 1994)). Moreover, considering that federal subpoenas can even apply to the President of the United States, the court found it unreasonable that they would not apply to Indian tribes. *Id.* (citing *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 656 (1890)).

Other jurisdictions have addressed whether a Board's action is one brought by the United States by looking at the respective purposes and characters of the Board and the NLRA. Unlike Title VII, which "depends principally upon private causes of action for enforcement," *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1067 (9th Cir. 2004), the NLRA is enforced primarily through the actions of the Board. *Id.* The Supreme Court noted in *National Licorice Co. v. NLRB*:

5

> The Board acts in a public capacity to give effect to the declared public policy of the [NLRA] to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting the "exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing.

309 U.S. 350, 362 (1940). Likewise, the Board's General Counsel "is charged with the responsibility of representing the public interest, not that of private litigants." *Philip Carey Mfg. Co., Miami Cabinet Div. v. NLRB*, 331 F.2d 720, 734 (6th Cir. 1964) ("When, in the prosecution of a complaint, facts come to his knowledge showing that there was insufficient basis for proceeding thereon, it was his duty to make a motion to amend.").

Private actions under the NLRA are available only in exceptional circumstances. *Rivera*, 364 F.3d at 1067 (citing *Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 536–37 (1989) (recognizing exceptional private actions for breaches of the duty of fair representation and actions to enforce collective bargaining agreements)). Here, the Board's subpoena enforcement action is not an exceptional circumstance. The subpoena only seeks information relevant to verify Respondent's tribal sovereignty, to determine Respondent's effects on commerce, to determine whether federal jurisdiction exists, and to ascertain whether the Board would consider Respondent an "employer" under the NLRA.

The Court concludes that sovereign immunity is not a bar to enforcement of the Board's subpoena because this subpoena enforcement action is not brought by a private party.

### C. Jurisdiction to Enforce the Subpoena

Although the Board has broad authority to issue subpoenas, it has no independent authority to enforce them. Section 11(2) of the NLRA, 29 U.S.C. § 161(2), grants the federal district courts jurisdiction to enforce the Board's subpoenas. The granting of such power has been approved and exercised repeatedly by the courts. Consistent with the bounds of

reasonableness, subpoena enforcement may be sought in any district where the investigation is undertaken or where the subpoenaed entity is found, resides, or transacts business. *See* 29 U.S.C. § 161(2); *NLRB v. Ronny Line*, 50 F.3d 311, 313–14 (5th Cir. 1995) ("We therefore hold that the place of inquiry in 29 U.S.C. § 161(2) is the jurisdiction of the underlying NLRB investigation."). Since Respondent transacts business within this district from its place of business in Tower, Minnesota, this Court has personal jurisdiction over Respondent and subject matter jurisdiction over this subpoena enforcement proceeding.

### D. Whether the Subpoena Should Be Enforced

In determining whether to enforce this subpoena, this Court is not concerned with the merits of the underlying claim. *See EEOC v. Tempel Steel Co.*, 814 F.2d 482, 484–86 (7th Cir. 1987). Furthermore, when making such determinations, courts should not consider defenses to the merits of the underlying proceeding. *See id.* For example, in *Tempel Steel Co.*, the Seventh Circuit Court of Appeals held that the alleged untimeliness of a discrimination claim levied against an employer in connection with the termination of an employee did not negate the EEOC's investigative authority, and hence, did not provide a proper defense to enforcement of the EEOC's subpoena. *Id.* at 486. Thus, this Court's role is "sharply limited" in this proceeding because "[i]f every possible defense, procedural or substantive, were litigated at the subpoena enforcement stage, administrative investigations obviously would be subjected to great delay." *See id.* at 485 (citations omitted).

Four factors guide the Court in determining whether to enforce the administrative subpoena. If the subpoena was (1) issued pursuant to lawful authority and (2) for a lawful purpose, and (3) if the requested information is relevant to the lawful purpose and (4) not unreasonable, then the subpoena should be enforced. *See United States v. McDonnell Douglas*

*Corp.*, 751 F.2d 220, 226 (8th Cir. 1984) (citing *Okla. Press Publ'g. Co. v. Walling*, 327 U.S. 186, 208–09 (1946)); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (reasoning that "[law-enforcing] agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest"). Each requirement will be discussed in turn.

### 1. Issuance Pursuant to Lawful Authority

Respondent argues that this Court should not enforce the subpoena because the Board lacked jurisdiction to issue it. Specifically, Respondent argues that Congress did not intend the NLRA to apply to commerce with an Indian tribe or to interstate commerce resulting from business activities located on an Indian reservation, nor did Congress exercise its constitutional power in the NLRA to regulate commerce "with the Indian tribes." (Resp't's Resp. to Order to Show Cause at 6-7, 14; Docket No. 7.) In making this argument, Respondent reframed it as one concerning "jurisdiction" not "coverage" because "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of *coverage* under a particular federal statute," *see Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) (emphasis added). There is no need, however, to draw such a fine distinction in the present case. As previously mentioned, this Court may not consider defenses to the merits. *See Tempel Steel Co.*, 814 F.2d at 484–86. But in order for this Court to enforce the Board's subpoena, it must determine whether the Board had authority to issue the subpoena in the first place. *See McDonnell Douglas Corp.*, 751 F.2d at 226; *see also Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 492 (7th Cir. 1993) ("Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage.").

There are several factors in this case complicating the analysis as to whether the Board had authority to issue the subpoena, not the least of which are that Respondent is a tribal entity and that there are unique canons of construction governing the interplay of agency authority and tribal sovereignty. These factors make some of the parties' cited authority irrelevant. For example, *Fresenius Medical Care v. United States* concerned an administrative subpoena served on a medical provider pursuant to a statute, 18 U.S.C. § 3486, which authorized such subpoenas in investigations of federal health care offenses. 526 F.3d 372, 375 (8th Cir. 2008). Although *Fresenius* sets forth the relevant standard for enforcement of an administrative subpoena, it provides little other useful guidance in the unique circumstances at hand. However, by charting a course beginning with the Constitution and through the NLRA's plain language, a brief history of the Board, and other case precedent, the Court is able to determine that that subpoena was issued pursuant to lawful authority.

Article I, section 8, clause 3 of the Constitution provides, "Congress shall have power to [] regulate Commerce [] with the Indian Tribes." In the case of tribal nations, however, such power cannot be exercised without the tribe's waiver of sovereign immunity or by Congress waiving such immunity by congressional consent. *See United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940).

Sections 9(c) and 10 of the NLRA charge the Board with two main functions, one of which is relevant to the present case: to prevent and remedy unfair labor practices by employers or unions. 29 U.S.C. §§ 159(c), 160. Once an employer, employee, or union files a charge of an unfair labor practice, the Board cannot perform its charged function until it determines whether

the employer affects interstate commerce and constitutes an "employer"[4] under the NLRA. *See* 29 U.S.C. §§ 159(c), 161. Section 11 of the NLRA grants to the Board and its agents broad investigatory authority, including the power to subpoena any evidence "that relates to any matter under investigation or in question." 29 U.S.C. § 161(1); *see also NLRB v. Interstate Material Corp.*, 930 F.2d 4, 6 (7th Cir. 1991) (describing the Board's broad investigatory powers); *NLRB v. Steinerfilm, Inc.*, 702 F.2d 14, 15 (1st Cir. 1983) (same); *NLRB v. G.H.R. Energy Corp.*, 707 F.2d 110, 113 (5th Cir. 1982) (same). This broad subpoena power enables the Board "to get information from those who best can give it and who are most interested in not doing so." *Morton Salt Co.*, 338 U.S. at 642.

The Supreme Court "has consistently declared that in passing the [NLRA], Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963) (emphasis in original). Notably, the NLRA does not exclude tribal nations from its coverage on its face.[5] The NLRA only expressly excludes "the United States or any wholly

---

[4] There is no need to resolve whether Respondent is an "employer" under the NLRA at this time. Such an issue is a matter regarding the NLRA's coverage, and "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute." *See Shaw*, 668 F.2d at 989. "[I]n a subpoena enforcement action, the agency cannot be required to demonstrate that the very matter or entity it seeks to investigate under its statutory investigatory powers is covered by the enabling statute since the '[a]uthority to investigate the existence of violations . . . include[s] the authority to investigate coverage.'" *Id.* (citations omitted).

[5] Congress has, however, specifically excluded tribes from the following: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(1); Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111(5)(b); and the Workers Adjustment and Retraining and Notification Act, 20 C.F.R. § 639.3(a)(1).

owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act."[6] 29 U.S.C. § 152(2).

Nonetheless, the Board initially interpreted the NLRA to implicitly exclude Indian tribes as being "any State or political subdivision thereof" under section 2(2) of the NLRA, 29 U.S.C. § 152(2), based on tribal sovereign immunity. *See, e.g.*, *S. Indian Health Council, Inc.*, 290 N.L.R.B. 436, 437 (1988) (finding a health care clinic owned by a consortium of tribes on a reservation implicitly exempt from the NLRA as a governmental entity); *Fort Apache Timber Co.*, 226 N.L.R.B. 503, 506 (1976) (noting the possibility of finding the tribal enterprise explicitly exempt from the NLRA because it was similar to a state).

Later, the Board rejected its prior interpretation by focusing on a tribal enterprise's location rather than on a tribe's sovereign nature. The Board reversed course because "'[a]s tribal businesses have grown and prospered, they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses.'" *San Manuel Indian Bingo & Casino v. NLRB* (*San Manuel I*), 341 N.L.R.B. 1055, 1056 (2004). Generally, if a tribal enterprise operated on a reservation, the NLRA implicitly excluded the enterprise. *See, e.g.*, *Fort Apache Timber Co.*, 226 N.L.R.B. at 506. If a tribal enterprise operated off the reservation, on the other hand, the Board applied a three-factor test established by the Supreme Court in *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 115–18 (1960), as narrowed by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1115–16 (9th Cir. 1985). Under the *Tuscarora-Coeur d'Alene* analysis, statutes of general applicability that are

---

[6] Several courts have reasoned that because Congress defined an "employer" by listing specific entities that are *not* employers, the canon of construction *expressio unius est exclusio alterius* should apply, such that Congress intended to include everything else that qualifies as an employer, such as an Indian tribe. *See, e.g.*, *San Manuel Indian Bingo & Casino v. NLRB*) (*San Manuel II*), 475 F.3d 1306, 1316 (D.C. Cir. 2007).

silent on the issue of applicability to Indian tribes—like the NLRA—will apply to tribal enterprises unless one of the three following exceptions applies:

> (1) [T]he law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations."

*Sac & Fox, Indus., Ltd.*, 307 N.L.R.B. 241, 244 (1992).

In *San Manuel I*, 341 N.L.R.B. 1055, and *Yukon Kuskokwim Health Corp.*, 341 N.L.R.B. 1075 (2004), the Board adopted the current, slightly revised approach to the *Tuscarora-Coeur d'Alene* analysis.[7] Under this approach, the Board determines whether it has jurisdiction based on a case-by-case analysis, regardless of the tribal enterprise's location. *See San Manuel I*, 341 N.L.R.B. at 1059 ("Indeed, there is nothing in [s]ection 2(2) to suggest that the exemption for 'employer' turns on where the entity is located."). Specifically, the Board will assert jurisdiction unless (1) the federal Indian policy requires that the Board decline jurisdiction, or (2) policy considerations militate against the assertion of the Board's discretionary jurisdiction. *Id.* at 1059–63. The Board continues to apply the *Tuscarora-Coeur d'Alene* analysis under the first prong. *See id.* at 1060–61.

In light of all of the above, to decide whether the NLRA applies to Respondent in this subpoena enforcement proceeding, the Court must consider the three aforementioned exceptions: (1) whether use of the NLRA would "touch exclusive self-governance rights in purely intramural matters," (2) whether applying the NLRA would abrogate treaty rights, and (3) whether Congress intended the NLRA not to apply to Indian tribes. *See Coeur d'Alene*, 751 F.2d at 1116; *see also NLRB v. Chapa De Indian Health Pgm., Inc.*, 316 F.3d 995, 996-97, 999 (9th Cir. 2003).

---

[7] In 2007, the D.C. Circuit upheld *San Manuel I*, and the San Manuel Band did not seek Supreme Court review. *See San Manuel II*, 475 F.3d at 1306, 1318–19.

First, as far as this proceeding is concerned, applying the NLRA to Respondent's business would not "touch exclusive rights of self-governance in purely intramural matters." "Purely intramural matters" generally involve "tribal membership, inheritance rules, and domestic relations." *See id.* at 1116. Courts have held that "Tribe-run" business enterprises, such as a "Tribe-owned" casino, acting in interstate commerce do not fall under the "self-governance" exception. *San Manuel I*, 341 N.L.R.B. at 1063 (citing *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1129 (11th Cir. 1999)).

Respondent nevertheless argues that its business is an "intramural matter" because its casino revenues are used to support tribal governmental programs. There is no dispute that Respondent's tribal government programs—such as its youth programs, elderly assistance programs, emergency services, or health care services—are intramural matters. But, as noted in *San Manuel I*, to infer that the means by which Respondent generates its revenue to support such services constitute "purely intramural matters" under *Coeur d'Alene* would swallow the *Tuscarora* analysis. *See id.* More importantly, the Board's subpoena does not touch Respondent's right to self-governance in an intramural matters, given that the subpoena merely seeks information regarding Respondent's effects on interstate commerce, affiliation of customers and employees, treaties, and other information directly related to Indian tribal discretionary issues.

In a broader sense, in order to determine whether application of the NLRA would impede Respondent's right of self-governance in a purely intramural matter, the Board, and possibly a future court, will need to consider the very evidence Respondent is seeking to withhold.[8]

---

[8] In this regard, the subpoena served by the Board is comparable to a request for jurisdictional discovery. Indeed, two areas for which information is requested in the subpoena are federal jurisdiction and tribal sovereignty.

Information concerning the nature of the casino's business, the composition of its workforce, and revenues and sales is central to assessing this exception. *See Chapa De Indian Health Pgm., Inc.*, 316 F.3d at 1000 (considering such facts in determining that application of the NLRA to a tribal housing authority would not affect a purely intramural matter affecting self-governance). Thus, application of this exception is not appropriate at this time.

Turning to the second exception, Respondent argues that applying the NLRA to the Band would abrogate its treaty rights to govern its own employment relationships, to exclude nonmembers, and to manage its own economic resources. Respondent does not identify a particular treaty provision at risk of abrogation, but asserts that application of the NLRA will abrogate its inherent sovereign rights. (Resp't's Resp. to Order to Show Cause at 14-26; Docket No. 7). In Respondent's surreply, it concedes it has not made a full record concerning its treaties. (Resp't's Surreply at 3; Docket No. 13.) To succeed under the treaty-abrogation exception, however, Respondent must identify the particular treaty rights at risk, explain how the relevant provisions should be construed, and describe how application of the NLRA would impermissibly restrict those rights. *See Solis v. Matheson*, 563 F.3d 425, 434-35 (9th Cir. 2009). Although Respondent attached numerous treaties as exhibits, it did not identify particular provisions, explain their construction, or describe the NLRA's probable effect.

To properly assess the second exception in this case, the Court has to know, at minimum, whether a particular treaty provision expressly permits the Band to create a system to enforce employment rights or expressly refers to terms of employment. *See id.* at 435; *see also Reich*, 4 F.3d 490, 494 (7th Cir. 1993) (in a subpoena enforcement action, finding that no treaty right governed the employment issue at hand); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 934 (7th Cir. 1989) (where a tribe failed to identify a specific treaty provision at risk, finding ERISA

would not abrogate treaty rights). On the present record, the Court cannot conclude that application of the NLRA would abrogate the Band's treaty rights.

Lastly, regarding the third exception, nothing in the NLRA's legislative history suggests that Congress intended to foreclosure the Board from asserting jurisdiction over Indian tribes. *San Manuel I*, 341 N.L.R.B. at 1058 (citing *Chapa De Indian Health Program, Inc.*, 316 F.3d 995 at 1002 (affirming order enforcing Board subpoena, based on conclusion that jurisdiction was not plainly lacking)). In fact, although minimal, there is legislative history suggesting that Congress intended to include Indian tribes within the NLRA's reach. In 1999, both Houses of Congress passed amendments to the Indian Self-Determination Act ("ISDA") of 1975 that, in pertinent part, would have excluded "an Indian tribe carrying out activities authorized by the ISDA" from the NLRA's definition of "employer." *Id.* Before final passage of the amendments in 2000, the House of Representatives dropped this exclusionary language. *Id.*

Because application of the *Tuscarora-Coeur d'Alene* standard poses no impediment to the assertion of the Board's jurisdiction, the final step in this Court's analysis is to determine whether policy considerations militate against the assertion of the Board's discretionary jurisdiction in the present subpoena enforcement proceeding. The purpose of this analysis is to weigh the Board's interests in effectuating federal labor policy against the Indian tribe's interests in maintaining autonomy. *See id.* at 1062. The Board noted in *San Manuel I* that its interest in effectuating the NLRA's policies is likely to be lower when a tribe engages in traditional tribal functions that involve non-Indians, as such endeavors generally are less likely to substantially affect interstate commerce. *See id*. at 1063. Here, the Board's interests in effectuating federal labor policy outweigh Respondent's, as only a subpoena enforcement action is at issue. The Board's subpoena requests information directly related to whether Respondent's business

"substantially affects" interstate commerce. Although Respondent's response includes figures regarding the general demographics of its employees, it does not include its customers' demographics or its gross annual revenues. Thus, because no administrative record has been completely developed, the Board should be given the chance to investigate these matters, among others, to establish whether coverage under the NLRA exists. *See Shaw*, 668 F.2d at 989.

Although the revised *Tuscarora-Coeur d'Alene* analysis is complete, the Court's inquiry is not at an end. Both the *San Manuel II* court and *San Manuel I* dissent acknowledged that the *Tuscarora-Coeur d'Alene* analysis is in tension with the longstanding canons of construction that "(1) ambiguities in a federal statute must be resolved in favor of Indians, and (2) a clear expression of congressional intent is necessary before a court may construe a federal statute so as to impair tribal sovereignty." *San Manuel II*, 457 F.3d at 1311 (citations omitted).[9] Respondent does not rely on the first canon to support its argument that the NLRA is inapplicable to its business, only the second.

*EEOC v. Fond du Lac Heavy Equipment Co. & Construction Co.*, 986 F.2d 246 (8th Cir. 1993), clarified the clear-congressional-intent canon in the Eighth Circuit. "[The] general rule in *Tuscarora* . . . does not apply when the interest sought to be affected is a specific right reserved to the Indians. . . . Specific Indian rights will not be deemed to have been abrogated or limited absent a 'clear and plain' congressional intent." *Id.* at 247 (citing *United States v. Dion*, 476 U.S. 734, 738 (1986)). The Eighth Circuit explained further, "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the

---

[9] The D.C. Circuit also noted that "*Tuscarora*'s statement is of uncertain significance, and possibly dictum, given the particulars of that case. Unlike the NLRA, the Federal Power Act at issue in *Tuscarora* included a specific limitation on eminent domain on Indian reservations." *Id.* at 1311 (citing *Tuscarora*, 362 U.S. at 107).

16

general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests." *Id*. (citing *United States v. White*, 508 F.2d 453, 455 (8th Cir. 1974)).

The precise question at issue in *Fond du Lac* was whether the ADEA applies to Indian tribes. *Id*. at 248–50. The court ultimately concluded that the ADEA did not apply because the age discrimination dispute involved a "strictly internal matter" and neither the ADEA nor its legislative history indicated a clear and plain congressional intent to apply the ADEA to Indian tribes. *Id.* at 250.

Respondent urges the Court to apply *Fond du Lac* to this case and determine that the Band is not subject to the NLRA. This Court will not do so, however, because *Fond du Lac* is substantively and procedurally distinguishable. Procedurally, *Fond du Lac* was not a pre-complaint subpoena enforcement action but a fully litigated case decided on the merits. Here, the Board's subpoena merely requests information related to whether Respondent's business "substantially affects" interstate commerce. If the developed record later reveals that the dispute at issue does not involve a strictly internal matter, especially if Respondent substantially affects interstate commerce because, among other things, its customers are nonmembers, then a court will have to decide whether the NLRA should apply to the underlying merits of the case. *Cf. San Manuel II*, 475 F.3d at 1315 ("Second, the vast majority of the Casino's employees and customers are not members of the Tribe, and they live off the reservation. For these reasons, the Tribe is not simply engaged in internal governance of its territory and members."). Substantively, *Fond du Lac* addressed the ADEA, not the NLRA, and the two statutes are not similar in scope, language, purpose, or enforceability.

Moreover, as Respondent concedes, the Supreme Court has never explicitly overruled *Tuscarora*. *See San Manuel I*, 341 N.L.R.B. at 1061 ("[A]bsent the [Supreme] Court's

acknowledgment that *Tuscarora* is no longer good law, the Board is bound to follow it."); *see also id*. at 1064 n.18 (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")). Nor are *Tuscarora-Coeur d'Alene* and *Fond du Lac* necessarily incompatible. *See, e.g.*, *Prescott v. Little Six, Inc.*, 284 F. Supp. 2d 1224 (D. Minn. 2003) (holding ERISA applied to a tribal casino employer in part because the casino's alleged conduct had extramural effects and the casino failed to show how applying ERISA would affect the tribal community's inherent right of self-government), *rev'd on other grounds*, 387 F.3d 753 (8th Cir. 2004).

Based on all the above, the Court finds *Tuscarora-Coeur d'Alene* the appropriate standard to apply, not *Fond du Lac*. Under that standard and given the policy considerations militating in favor of the Board asserting its discretionary jurisdiction, the Board issued its subpoena pursuant to lawful authority.

### 2. Lawfulness of Purpose, Relevance, and Reasonableness

The three remaining requirements for enforcing the administrative subpoena are that the subpoena is for a lawful purpose, requests information relevant to the lawful purpose, and requests information that is reasonable. *See McDonnell Douglas Corp.*, 751 F.2d at 226. Neither party discusses these requirements at length, and all three favor enforcement.

First, an investigative subpoena may properly seek evidence regarding all issues under investigation, including potential defenses. *See NLRB v. North Bay Plumbing*, 102 F.3d 1005, 1008 (9th Cir. 1996). Here, the Board's subpoena is for a lawful purpose, since its purpose is to investigate Respondent's affects on commerce, to establish federal jurisdiction, to analyze

18

Respondent's characterization as a tribal sovereign, and to determine whether the Board will consider Respondent an "employer" within the meaning of the NLRA. *See* 29 U.S.C. §§ 153(d), 159(c)(1), 160(a). Second, courts have noted that for purposes of an administrative subpoena, "the notion of relevancy is a broad one . . . . So long as the material requested 'touches a matter under investigation,' an administrative subpoena will survive a challenge that the material is not relevant." *See, e.g.*, *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Board*, 878 F.2d 875, 882 (5th Cir. 1989) (citations omitted). Thus, the information requested by the Board is relevant to a lawful purpose. Finally, the information is not unreasonable because the Board will use the information to decide whether to proceed with the Union's petition regarding its allegation that Respondent engaged in unfair labor practices under the NLRA. *See* 29 U.S.C. §§ 159(c), 160(b).

### III. CONCLUSION

Although Respondent possesses sovereign immunity, such immunity is not absolute. The Board can bring a subpoena enforcement action against Respondent because the action is brought by an agent of the United States. The Board issued the subpoena pursuant to lawful authority and for a lawful purpose, requested information relevant to the lawful purpose, and did not demand unreasonable information. Accordingly, the subpoena should be enforced.

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. The Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum (Docket No. 1) be **GRANTED**; and

2. Respondent be ordered to appear before an agent of the Board at a time, date, and location to be set by the Board; to produce the subpoenaed documents; and to testify and answer any and all questions relevant to the matters in question in the proceedings before the Board.

Dated this 29th day of May, 2009.

                                                s/ *Jeanne J. Graham*
                                                JEANNE J. GRAHAM
                                                United States Magistrate Judge

**NOTICE**

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by serving and filing specific, written objections by **June 12, 2009**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words and must comply with all other requirements contained in Rule 7.1(c) and (e). The District Court Judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.