# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD, | MISC. No. 08-0065 (JRT/JJG) |
| Applicant, | **MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |
| v. | |
| FORTUNE BAY RESORT CASINO, | |
| Respondent. | |

Joseph H. Bornong, **NATIONAL LABOR RELATIONS BOARD**, 330 South Second Avenue, Suite 790, Minneapolis, MN 55401, for applicant.

Henry M. Buffalo, Jr., Jessica Intermill, Joseph F. Halloran, and Mark A. Anderson, **JACOBSON, BUFFALO, MAGNUSON, ANDERSON & HOGAN**, 1295 Bandana Boulevard, Suite 335, Saint Paul, MN 55108, for respondent.

On December 9, 2008, applicant National Labor Relations Board (the "Board") filed an Application for an Order Requiring Obedience to Subpoena Duces Tecum. (Docket No. 1.) In a Report and Recommendation, United States Magistrate Judge Jeanne J. Graham recommended that the Court grant the Board's application. (Report & Recommendation at 19, Docket No. 14.) The case is before the Court on respondent Fortune Bay Resort Casino's ("Fortune Bay") objections to the Report and Recommendation. (Docket No. 15.) After reviewing *de novo* those portions of the Report and Recommendation to which Fortune Bay objected, 28 U.S.C. § 636(b)(1)(C); D. Minn. LR 72.2, the Court overrules the objections and adopts the Report and Recommendation for the reasons set forth below.

# BACKGROUND

Fortune Bay is a wholly owned and managed governmental entity of the Bois Forte Band of Chippewa Indians (the "Band"), which is a federally recognized Indian tribe. (Response to Order to Show Cause at 18, Docket No. 7.) Fortune Bay operates a hotel, resort, and casino on the Band's Lake Vermillion Reservation pursuant to a tribal gaming ordinance and license issued by the Bois Forte Reservation Tribal Council. (*Id.* at 3.) Fortune Bay employs approximately 450 people, one-third of whom are Native Americans, and of the Native Americans employed, eighty-two percent are Band members. (*Id.* at 19.) Customers of the Fortune Bay Resort Casino include both members and nonmembers. (Board's Mem. in Supp. at 3, Docket No. 2.)

In 2007 the United Steelworkers Union (the "Union") began efforts to organize Fortune Bay's employees. (*Id.*) On or about August 4, 2008, Fortune Bay terminated employee Rorie Farr, a Band member, based on her alleged failure to show up for work as scheduled without giving notice as required under Fortune Bay's personnel policy. (*Id.*) The Board claims that Farr orally appealed her discharge to the Band's Tribal Chairman. On August 18, 2008, the Union filed an unfair labor practice charge with the Board alleging that Farr's termination was motivated by the Union's organizing activities, but the Union withdrew that charge on October 9, 2008. (*Id.* at 4 & n.1; Response to Order to Show Cause at 4, Docket No. 7.) The Tribal Chairman later told Farr that she was rehired, but Fortune Bay's CEO withdrew the reinstatement offer. (Board's Mem. in Supp. at 4, Docket No. 2.)

On October 14, 2008, the Union filed another charge against Fortune Bay alleging that Fortune Bay violated subsections (1), (3), and (4) of section 8(a) the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, by refusing to reinstate Farr in retaliation for participating in a previous case before the Board and in retaliation for engaging in union activities. (*Id.* at 1.) After the Union filed its charge, the Board, through its General Counsel, commenced an investigation in accordance with section 10(a) of the NLRA and section 102.15 of the Board's Rules to determine whether Fortune Bay had engaged in unfair labor practices. (Application ¶ 3, Docket No. 1); *see also* 29 U.S.C. §§ 153(a),(d), 159(c)(1), 160 (a). On October 31, 2008, the Board served on Fortune Bay a subpoena duces tecum to appear before an agent of the Board and produce certain subpoenaed documents. (*Id.* ¶ 4.) The subpoena "seeks information relevant to [Fortune Bay's] effects on commerce, to establish federal jurisdiction, . . . to [establish] attributes of tribal sovereignty, [and] to establish whether the Board will consider [Fortune Bay] an 'employer' within the meaning of the NLRA." (Board's Mem. in Supp. at 1-2, Docket No. 2.) Fortune Bay objected to the subpoena, and the Board applied to this Court for an order to enforce the subpoena pursuant to section 11(2) of the NLRA. (Application, Docket No. 1.)

After receiving a response from Fortune Bay to the Magistrate Judge's Order to Show Cause, as well as the Board's reply and Fortune Bay's surreply, the Magistrate Judge filed a Report and Recommendation recommending that the Court grant the Board's Application. The Magistrate Judge concluded in her Report and Recommendation that (1) the Court has jurisdiction over the subpoena enforcement

proceeding; (2) the instant enforcement action was brought by the Board, as an administrative agency of the United States, and not by a private party; (3) the Court has personal jurisdiction over Fortune Bay and subject matter jurisdiction over the subpoena enforcement action; and (4) that the subpoena should be enforced. (Report & Recommendation, Docket No. 14.) Fortune Bay timely filed objections to the Report and Recommendation, arguing that (1) under established Indian-law canon and Eighth Circuit law, the Board did not have jurisdiction to issue the subpoena; and (2) the Band is immune from the underlying Board proceeding under the NLRA on sovereignty grounds because a private party – the Union – initiated that proceeding.

## DISCUSSION

The primary issue before the Court is whether the Board had jurisdiction under the NLRA to issue the subpoena on Fortune Bay, a business enterprise wholly owned and managed by the Band on the Band's Lake Vermillion Reservation. For the reasons set forth below, the Court concludes that the Board had jurisdiction to issue the subpoena in an effort to establish the NLRA's coverage over Fortune Bay, and the Court may enforce that subpoena.

## I.     THE BOARD HAD JURISDICTION TO ISSUE THE SUBPOENA.

### A.     The Board's Investigative Role

The Board's subpoena seeks information relating to Fortune Bay's effects on interstate commerce, to federal jurisdiction, to attributes of tribal sovereignty, and to

Fortune Bay's status as an "employer" within the meaning of the NLRA. (Board's Mem. in Supp. at 2, Docket No. 2.)

In considering whether to enforce the Board's subpoena, the Court is not concerned with the merits of the underlying claim, and does not consider Fortune Bay's potential defenses to the merits of the underlying proceeding. *Cf. E.E.O.C. v. Tempel Steel Co.*, 814 F.2d 482, 484-86 (7th Cir. 1987). Instead, the Court considers four factors: (1) whether the subpoena was issued pursuant to lawful authority; (2) whether the subpoena was issued for a lawful purpose; (3) whether the information requested in the subpoena is relevant to the lawful purpose; and (4) whether the subpoena was reasonable. *See United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 226 (8th Cir. 1984) (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208-09 (1946)). In other words, as the Eighth Circuit held in *E.E.O.C. v. Peat, Marwick, Mitchell & Co.*, "[t]he showing of reasonable cause required to support an application for enforcement of a subpoena duces tecum is satisfied . . . by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." 775 F.2d 928, 930 (8th Cir. 1985) (internal quotation marks omitted; second alteration in original).

In *Peat, Marwick, Mitchell & Co.*, the Eighth Circuit affirmed a district court's order requiring an employer to produce documents subpoenaed by an administrative agency, the Equal Employment Opportunity Commission ("EEOC"), in relation to the EEOC's investigation of alleged violations of the Age Discrimination in Employment Act ("ADEA"). 775 F.2d at 931. The employer appealed the district court's order,

arguing that the subpoena could not be enforced because the EEOC's investigation was not for a congressionally authorized, legitimate purpose; that is, the employer argued that the ADEA did not apply to the employer. *Id.* 929-30. The Eighth Circuit rejected the argument, stating:

> Congress has established the EEOC as the administrative body empowered to investigate violations of the ADEA and has given the EEOC subpoena power in order to carry out its investigations. The authority to investigate violations includes the authority to investigate coverage under the statute. It can no longer be disputed that "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute." The initial determination of the coverage question is left to the administrative agency seeking enforcement of the subpoena. Often a coverage question cannot be resolved **until the administrative agency has had an opportunity to examine the subpoenaed records.**

*Id.* at 930 (emphasis added and citations omitted).

Here, the Board seeks subpoenaed documents to establish jurisdiction to bring unfair labor practice charges under the NLRA against Fortune Bay. In that sense, the Board's application is akin to jurisdictional discovery, as it seeks documentation pertaining to federal jurisdiction and tribal sovereignty. Under these circumstances, the Board's subpoena duces tecum is reasonable in scope and is brought for a legitimate purpose. *See id.* ("The EEOC's investigation of [the employer] is in an effort to determine whether [the employer's] retirement practices and policies discriminate against individuals classified as employees for purposes of the ADEA. Thus, EEOC's investigation is for a legitimate purpose authorized by Congress.").

Fortune Bay objects to the Magistrate Judge's conclusion that the Board issued the subpoena pursuant to lawful authority. Fortune Bay primarily argues that the Magistrate

Judge failed to apply the appropriate standard in concluding that the NLRA applies to the Band, and thus that the Board had jurisdiction to issue the subpoena in the first place.

Although the Court need not consider the merits of the underlying proceeding, the parties' dispute about the correct standard to apply for evaluating the NLRA's application to Fortune Bay is intertwined with the Board's asserted authority to issue the subpoena in the first place. Fortune Bay argues that application of the NLRA to the Band would violate its rights of self-government and territorial sovereignty. Fortune Bay argues that under Eighth Circuit law, the NLRA does not apply to the Band, and therefore the Board has no authority under section 11 of the NLRA to issue the subpoena.

The Court thus turns to a discussion of the appropriate standard for determining whether the NLRA applies to Fortune Bay and the Band. Although the Court does not reach the question of whether the NLRA applies to the Band and Fortune Bay, the Court concludes that the Board had a legitimate and lawful basis for issuing the subpoena in pursuit of its investigation to establish jurisdiction.

## B.     The Board's Authority to Issue Subpoenas Under the NLRA

The NLRA charges the Board with the responsibility of preventing and remedying unfair labor practices by employers, unions, or any other person. *See* 29 U.S.C. §§ 159(c), 160. The Board may not perform that function and commence a full investigation into allegedly unfair labor practices, however, until it determines that the employer affects interstate commerce and is an "employer" under the NLRA. *See id.* §§ 159(c), 161. Section 11 of the NLRA grants the Board broad investigatory authority, including

the power to subpoena evidence "that relates to any matter under investigation or in question." *Id.* § 161(1); *see, e.g.*, *N.L.R.B. v. Interstate Material Corp.*, 930 F.2d 4, 6 (7th Cir. 1991); *N.L.R.B. v. Steinerfilm, Inc.*, 702 F.2d 14, 15 (1st Cir. 1983). This broad subpoena power enables the Board "to get information from those who best can give it and who are most interested in not doing so." *Cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950).

The NLRA authorizes the Board to assert jurisdiction over all conduct that may be constitutionally regulated under the Commerce Clause. *N.L.R.B. v. Fainblatt*, 306 U.S. 601, 604-07 (1939). The Board has limited its jurisdictional authority to employers that have a "substantial" effect on interstate commerce. *El Dorado, Inc.*, 151 N.L.R.B. 579, 582 (1965).

Although the Board has broad authority to issue subpoenas, it does not have independent authority to enforce them. Section 11(2) of the NLRA grants federal district courts jurisdiction to enforce subpoenas issued by the Board. 29 U.S.C. § 161(2). The Board may seek enforcement of subpoenas in any district where the investigation is undertaken or where the subpoenaed entity is found, resides, or transacts business. *See id.*; *N.L.R.B. v. Line*, 50 F.3d 311, 313 (5th Cir. 1995) ("[T]he place of inquiry in 29 U.S.C. § 161(2) is the jurisdiction of the underlying NLRB investigation.").

Given the Board's general authority to issue subpoenas, the Court turns to the question of whether the Board, pursuant to the NLRA, may issue a subpoena on Fortune Bay, which is wholly owned and managed by a federally recognized tribe.

**C.      Application of the NLRA to Tribal Enterprises.**

The Commerce Clause of the United States Constitution states in relevant part that "Congress shall have power to . . . regulate Commerce . . . with the Indian Tribes." U.S. Const. Art. I, section 8, cl. 3. Congress may not exercise that power with respect to tribal nations, however, unless the tribe waives sovereign immunity or unless Congress authorizes the waiver of such immunity. *See United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512 (1940).

The Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963). The NLRA does not expressly exclude tribal nations as employers from coverage, but does expressly exclude "the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act." 29 U.S.C. § 152(2).

The Board initially interpreted the NLRA to implicitly exclude tribal nations from coverage under the statute, finding that, based on tribal sovereign immunity, Indian tribes were included in the exemption of "any State or political subdivision thereof." *See, e.g.*, *S. Indian Health Council, Inc.* 290 N.L.R.B. 436, 437 (1988); *Fort Apache Timber Co.*, 226 N.L.R.B. 503, 506 (1976). The Board later rejected that interpretation after finding that "[a]s tribal businesses have grown and prospered, they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses."

*San Manuel Indian Bingo & Casino (San Manuel I)*, 341 N.L.R.B. 1055, 1056 (2004). In *San Manuel I*, the Board stated that it would consider whether it has jurisdiction on a case-by-case basis, regardless of whether a tribal enterprise was located on or off a reservation. *Id.* at 1059-60, 1062 ("[T]here is nothing in NLRA Section 2(2)[1] to suggest that the exemption for 'employer' turns on **where** the entity is located.").

The Board's present case-by-case analysis provides that the Board will assert jurisdiction unless (1) the federal Indian policy requires that the Board decline jurisdiction, or (2) policy considerations militate against the assertion of the Board's discretionary jurisdiction. *See San Manuel I*, 341 N.L.R.B. at 1059-63. The first prong is premised on a three-factor test established by the United States Supreme Court in *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 115-18 (1960), as narrowed by exceptions described by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985). In *Tuscarora*, the United States Supreme Court stated "that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116. In *Coeur d'Alene*, the Ninth Circuit cited *Tuscarora* as a general rule, and held that federal statutes of general applicability that are silent as to the applicability of their provisions to Indian tribes apply to tribal enterprises unless one of three exceptions applies:

> (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by

---

[1] Section 2(2) of the NLRA "vests jurisdiction in the Board over any 'employer' doing business in this country save those Congress excepted with careful particularity." *San Manuel I*, 341 N.L.R.B. at 1057 (some internal quotations marks omitted).

legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . ."

*Coeur d'Alene*, 751 F.2d at 1116 (quoting *United States v. Farris*, 624 F.2d 890, 893-94 (9th Cir. 1980)); *see also San Manuel I*, 341 N.L.R.B. at 1059; *Sac & Fox Indus., Ltd.*, 307 N.L.R.B. 241, 244 (1992).

The Magistrate Judge applied the *Tuscarora-Coeur d'Alene* analysis – in addition to the second policy prong outlined by the Board in *San Manuel I* – to conclude that the Board had jurisdiction to issue the subpoena on Fortune Bay. Fortune Bay argues that the Magistrate Judge erred in applying the *Tuscarora-Coeur d'Alene* standard because that standard (1) is based on non-binding dicta from the Supreme Court; (2) addresses only statutes of general application (and Fortune Bay contends that the NLRA is not generally applicable); and (3) is trumped by Eighth Circuit law and long-standing Indian-law canons. (Objections to Report & Recommendation at 3, Docket No. 15.) As to the third argument, Fortune Bay argues that the Court should apply the standard delineated by the Eighth Circuit in *E.E.O.C. v. Fond du Lac Heavy Equipment & Construction Co.*, 986 F.2d 246 (8th Cir. 1993). The Court briefly describes the *Fond du Lac* standard below before addressing Fortune Bay's arguments in order.

In *Fond du Lac*, the Eighth Circuit reiterated the Supreme Court's statement in *Tuscarora* that "general acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." *Id.* at 248 (internal quotation marks omitted). The Eighth Circuit further noted:

> This general rule in *Tuscarora,* however, does not apply when the interest sought to be affected is a specific right reserved to the Indians. **Specific

**Indian rights** will not be deemed to have been abrogated or limited absent a "clear and plain" congressional intent. A clear and plain intent may be demonstrated by an "express declaration" in the statute, by the "legislative history," and by "surrounding circumstances."

*Id.* (emphasis added; citations omitted). According to the Eighth Circuit, "[a]lthough the specific Indian right involved usually is based upon a treaty, such rights may also be based upon statutes, executive agreements, and federal common law." *Id.* The Eighth Circuit explained that "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes [sic] Indians and their property interests." *Id.* (internal quotation marks omitted).

Fortune Bay argues that under *Fond du Lac*, the NLRA affects the Band's specific Indian rights of self-governance and, because there is no evidence of congressional intent to apply that statute to tribes, the statute may not be applied to the Band.[2] (Objections to Report & Recommendation at 8, Docket No. 15.)

---

[2] The District of Columbia Circuit Court of Appeals, in reviewing an appeal from the Board's conclusions in *San Manuel I*, offered an alternative approach for evaluating whether a statute of general applicability applies to tribal nations. *San Manuel Indian Bingo & Casino v. N.L.R.B.* (*San Manuel II*), 475 F.3d 1306, 1313 (D.C. Cir. 2007) ("[T]he 'inquiry [as to whether a general law inappropriately impairs tribal sovereignty] is not dependent on mechanical or absolute conceptions of . . . tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake.'" (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)). The parties do not discuss that alternative test, however, and the Court accordingly does not apply that test here.

### D. Fortune Bay's Objections

#### 1. *Tuscarora* as Dictum

Fortune Bay first contends that the Court need not follow the *Tuscarora* "rule" because it is non-binding dictum. (Objections to Report & Recommendation at 3, Docket No. 15.) Indeed, other courts have noted that the *Tuscarora* rule is "of uncertain significance, and possibly dictum, given [that] . . . . the Federal Power Act at issue in *Tuscarora* included a specific limitation on eminent domain on Indian Reservations." *San Manuel II*, 475 F.3d at 1311; *see also Coeur d'Alene*, 751 F.2d at 1115. The characterization of *Tuscarora*'s language as dictum, however, appears to have had little effect on courts' willingness to adopt its language as a "general rule." The very case Fortune Bay cites in support of its arguments recites the "general rule in *Tuscarora*." *Fond du Lac*, 986 F.2d at 248; *see also Coeur d'Alene*, 751 F.2d at 1115 ("[Respondent] may be correct when it argues that this language from *Tuscarora* is dictum, but it is dictum that has guided many of our decisions."). Thus, although the language in *Tuscarora* may be dictum, the Court finds no reason to depart from other courts' reliance on that language in similar cases.

The Court also finds that the crux of the parties' dispute is about what exceptions apply to that general rule. The Board contends that the Court should evaluate the Board's jurisdiction to issue the subpoena under the exceptions outlined in *Coeur d'Alene*. In contrast, Fortune Bay contends that the Court must assess the Board's jurisdiction to issue the subpoena under the "specific Indian rights" exception provided in *Fond du Lac*. The two cases, in fact, share noticeable similarities. As a threshold matter, both cases

first direct a court to inquire whether the statute at issue is generally applicable. *Coeur d'Alene*, 751 F.2d at 1115; *Fond du Lac*, 986 F.2d at 248. Both cases provide for exceptions to a statute's application to tribes where the statute impinges on certain rights reserved to the Indians, including certain rights of tribal self-government. *Coeur d'Alene*, 751 F.2d at 1116-17; *Fond du Lac*, 986 F.2d at 248. The cases also call for courts to consider congressional intent when determining whether a law falls within an exception to the *Tuscarora* rule. *See Coeur d'Alene*, 751 F.2d at 1115; *Fond du Lac*, 986 F.2d at 248.

As Fortune Bay notes, however, the cases are dissimilar with respect to their approach to congressional intent and the legislative record. In *Coeur d'Alene*, the Ninth Circuit outlines an exception to *Tuscarora* where there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations." *Coeur d'Alene*, 751 F.3d at 1116 (internal quotation marks omitted; alteration in original). That is, a generally applicable statute that is silent about its applicability to tribes will apply to tribes **unless** there is proof that Congress intended that the law not apply to tribes (or if one of two other *Coeur d'Alene* exceptions applies). In *Fond du Lac*, the Eighth Circuit states that specific rights reserved to Indians will not be deemed abrogated or limited by a statute of general applicability "absent a clear and plain congressional intent" through express declaration in the statute, legislative history, or surrounding circumstances. *Fond du Lac*, 986 F.2d at 248 (internal quotation marks omitted). In other words, unless there is clear and plain congressional intent to the

contrary, a statute that is silent about its applicability to tribes is presumed **not** to apply to tribes if the statute abrogates or limits "specific Indian rights."

### 2.    The NLRA Is a Statute of General Applicability.

Fortune Bay next argues that the Court does not need to address the principle in *Tuscarora* because the NLRA is not a statute of general applicability.  (*See* Objections to Report & Recommendation at 3, Docket No. 15; Response to Order to Show Cause at 31, Docket No. 7.)  In support, Fortune Bay cites a Tenth Circuit case, *N.L.R.B. v. Pueblo of San Juan*, which concludes that "the NLRA by its terms is not a statute of general application, it excludes states and territories."  280 F.3d 1278, 1283 (10th Cir. 2000).  Other cases, however, assume or conclude that the NLRA is a generally applicable statute.  *See, e.g.*, *San Manuel II*, 475 F.3d at 1312; *N.L.R.B. v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 998 (9th Cir. 2003).

*Pueblo of San Juan* is not directly relevant to the Court's analysis; the Tenth Circuit considered "whether the NLRA preempts an Indian tribe from adopting a right-to-work ordinance applicable to employees of a non-Tribal company engaged in business activities on a reservation."  280 F.3d at 1282.  The Tenth Circuit did not hold that the NLRA does not apply to Indian tribes acting as employers, and in fact stated in its opinion after a rehearing *en banc*: "We begin by noting what the district court also took pains to point out, namely, that the general applicability of federal labor law is not at issue."  *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002)(en banc).

While the Eighth Circuit has not addressed the issue with respect to the NLRA, the Ninth Circuit has provided substantive analysis concluding that the NLRA is a statute of general applicability. In *Chapa De*, the Ninth Circuit rejected the contention that the NLRA is not a statute of general applicability merely because it has some exemptions. 316 F.3d at 998. The Ninth Circuit concluded that "[t]he issue is whether the statute is generally applicable, not whether it is universally applicable. We have previously held that other federal statutes that contain exemptions are nevertheless generally applicable." *Id.* (citing cases holding that the Occupational Safety and Health Act ("OSHA"), the Employee Retirement Income Security Act ("ERISA"), and the Contraband Cigarette Trafficking Act ("CCTA") are statutes of general applicability).

In sum, the NLRA's "exemptions are relatively limited," *Id.*, 316 F.3d at 998, and Congress clearly intended that the NLRA's reach would be broad, *Reliance Fuel Oil Corp.*, 371 U.S. at 226 ("Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause."). It is not necessary that the NLRA be universally applicable, only that it be generally applicable. Accordingly, the Court proceeds based on the threshold conclusion that the NLRA is a statute of general applicability.

> 3. **The Board Had a Legitimate Purpose for Issuing the Subpoena Under These Circumstances and Did So Pursuant to Lawful Authority.**

Fortune Bay argues that the *Fond du Lac* standard should "be the starting point" for the Court's analysis. (Objections to Report & Recommendation at 3, Docket No. 15.)

The Court does not need to reach the issue of whether it must apply the *Fond du Lac* standard in these circumstances or whether the *Fond du Lac* standard can be reconciled with the *Tuscarora-Coeur d'Alene* standard,[3] because, as the Court concludes below, even under the *Fond du Lac* standard, the Board has jurisdiction to issue the subpoena.

Under *Fond du Lac*, the threshold question before the Court is whether the NLRA affects "a specific right reserved to the Indians," which may include "areas traditionally left to tribal self-government." *Fond du Lac*, 986 F.2d at 248. Fortune Bay contends that "this case most certainly does involve specific Indian rights," including the Band's "sovereign rights to govern itself, regulate its internal matters, and manage its own economic resources." (Objections to Report & Recommendation at 6, Docket No. 15.) In particular, Fortune Bay asserts that "[t]he Band's operation of the Fortune Bay Casino is **directly** tied to its provision of governmental programs and services to its members," and notes that the Band's operation of Fortune Bay is "not mere corporate behavior," but "is the very heart of its governmental activity. . . . It **is** its youth programs, elderly assistance programs, emergency services, [and] health care services." (*Id.* at 6-7 (internal quotation marks omitted).)

---

[3] The U.S. Court of Appeals for the District of Columbia noted that the principle announced in *Fond du Lac* is reconcilable with *Tuscarora*:

> With regard to the alternative principle relied on by petitioners, that a clear statement of Congressional intent is necessary before a court can construe a statute to limit tribal sovereignty, we can reconcile this principle with *Tuscarora* by recognizing that, in some cases at least, a statute of general application can constrain the actions of a tribal government without at the same time impairing tribal sovereignty.

*San Manuel II*, 475 F.3d at 1312.

The Court concludes, however, that it is unclear in this case whether the NLRA affects rights specifically reserved to the Band. Recent case law demonstrates that facts relating to Fortune Bay's impact on non-Indians and interstate commerce may play a significant role in the Board's determination of whether it has jurisdiction to issue an unfair labor practices complaint against Fortune Bay. Here, Fortune Bay asserts that "[t]he Casino employs approximately 450 people, and one-third of these are Indians. Of the Indians employed at the Casino, 82% are members of the Band." (Response to Order to Show Cause at 19, Docket No. 7.) Fortune Bay's customer base includes both Band members and nonmembers, which the Court presumes includes non-Indians. (*See* Board's Mem. in Supp. at 3, Docket No. 2.) And although Fortune Bay is located entirely on the Band's Lake Vermillion reservation, that fact is not dispositive to the NLRA's applicability to the Band.

In *San Manuel I*, the Board concluded that it would not rely purely on considerations of location to decide whether the NLRA was a statute of general applicability that applied to tribal enterprises. *San Manuel I*, 341 N.L.R.B. at 1058-59. Rather, the Board concluded that it would evaluate the NLRA's applicability to a tribal enterprise on a case-by-case basis. *See id.* The Board explained that, in rejecting its previous conclusion that the NLRA implicitly excluded tribal nations from coverage, "tribal businesses have grown and prospered, [and] they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses." 341 N.L.R.B. at 1056.

The United States Court of Appeals for the D.C. Circuit in *San Manuel II* also

referred to the evolution and growth of tribal businesses:

> [T]he NLRA was enacted by a Congress that in all likelihood never
> contemplated the statute's potential application to tribal employers, and
> probably no member of that Congress imagined a small Indian tribe might
> operate like a closely held corporation, employing hundreds, or even
> thousands, of non-Indians to produce a product it profitably marketed to
> non-Indians. Further, the casino at issue here, though certainly exhibiting
> characteristics that are strongly commercial (non-Indian employees and
> non-Indian patrons), is also in some sense governmental (the casino is the
> primary source of revenue for the tribal government).

*San Manuel II*, 475 F.3d at 439-40.

In developing its own analysis to determine whether the NLRA applies to a tribe,

the D.C. Circuit emphasized the necessity of examining the facts relating to tribal

sovereignty and the commercial impact of a tribal enterprise:

> [W]hen a tribal government goes beyond matters of internal self-
> governance and enters into off-reservation business transaction[s] with non-
> Indians, its claim of sovereignty is at its weakest. In [that] situation, courts
> recognize the capacity of a duly established tribal government to act as an
> unincorporated legal person, engaging in privately negotiated contractual
> affairs with non-Indians, **but the tribal government does so subject to
> generally applicable laws**. The primary qualification to this rule is that the
> tribal government may be immune from suit.

*San Manuel II*, 475 F.3d at 1312-13 (emphasis added and citations omitted).

In *Coeur d'Alene*, the Ninth Circuit similarly addressed facts where a commercial

enterprise, wholly owned and operated by an Indian tribe, was substantially linked to and

involved with non-Indians: "[Respondent] employs approximately twenty workers, some

of whom are non-Indians. The Farm manager himself is a non-Indian." *Coeur d'Alene*,

751 F.2d at 1114. More recently, the Ninth Circuit in *Chapa De* applied the *Coeur*

*d'Alene* standard where the tribal enterprise, a health services program, was controlled by a board of directors that had no members of the authorizing tribe on its roster and where "[a]pproximately 405 of the patients [the tribal enterprise] serves are non-Native American, and 55% of [the tribal enterprise's] non-professional staff members are non-Native American." *Chapa De*, 316 F.3d at 997, 999.

Those cases and the Board's decision in *San Manuel I* demonstrate that facts relating to a tribal enterprise's impact on interstate commerce, particularly where the tribal enterprise's activities involve significant numbers of non-Indians, are relevant to the consideration of whether the NLRA applies to the tribal enterprise. Here, facts regarding, *inter alia*, Fortune Bay's commercial relationship to significant numbers of non-Indian employees and its substantial non-Indian customer base are pertinent to the Board's resolution of the jurisdiction question. It appears that Fortune Bay's "activities are commercial in nature – not governmental. Moreover, the operation of a casino – which employs significant numbers of non-Indians and that caters to a non-Indian clientele – can hardly be described as vital to the tribes' ability to govern themselves or as an essential attribute of their sovereignty."[4] *See San Manuel I*, 341 N.L.R.B. at 1061 (internal quotation marks omitted).

---

[4] The Magistrate Judge concluded that, as analyzed under the "intramural matters" exception in *Coeur d'Alene*, "the means by which [Fortune Bay] generates its revenue to support [tribal government programs]" are not necessarily related to the Band's sovereign right to govern itself. (*See* Report & Recommendation at 13, at Docket No. 14.) Fortune Bay objects to that conclusion, arguing that the Band's operation of Fortune Bay does not merely support the tribal programs, but instead is "the very heart of governmental activity." (Objections to Report & Recommendation at 7, Docket No. 15.) In this subpoena enforcement action, the Court does not ultimately conclude whether the primary source of the Band's revenues for government programs is directly related to specific Indian rights. (*See* Response to Order to Show Cause at

In sum, given Fortune Bay's potential commercial impact on and relationship to non-Indians, the Board has a reasonable and legitimate basis for issuing the subpoena seeking additional information regarding Fortune Bay's effects on interstate commerce, the affiliation of customers and employees, applicable treaties, and other similar information. *See Peat, Marwick, Mitchell & Co.*, 775 F.2d at 929-30. Fortune Bay does not substantively address the Magistrate Judge's analysis under the *Coeur d'Alene* standard, but the Court adopts that analysis to the extent that it supports the conclusion here that the Board properly issued the subpoena pursuant to its investigative role.

## II. SOVEREIGN IMMUNITY DOES NOT BAR THE BOARD'S ISSUANCE OF A SUBPOENA

Fortune Bay further argues that "the Band is immune from the proceeding in which the subpoena issued" because, according to Fortune Bay, the action was brought by the Union, a private litigant. (Objections to Report & Recommendation at 10, Docket No. 15.) Fortune Bay contends that "this Court must decide whether the Band is immune from a subpoena issued in an action **before** the Board **by** the United Steelworkers, an undisputedly private complainant." (*Id.* at 11.)

This subpoena enforcement action originated when the Board's General Counsel initially requested that the Board, as an administrative agency of the United States government, issue a subpoena duces tecum to Fortune Bay. (Application at 1, Docket

_____

19, Docket No. 7 ("[F]ully 100% of the Casino's profits are returned to the tribal government to fund governmental operations and programs like health care services, education, emergency services, youth programs, elder assistance, housing programs, economic development, road work, and community water and sewer systems.").) In the Court's analysis, that fact constitutes one portion of an entire array of facts, the details of which the Board is entitled to discover to determine whether it has jurisdiction to issue a complaint against Fortune Bay under the NLRA.

No. 1.)   The fact that the Board has yet to "issue[] a complaint against the Band," (Objections to Report & Recommendation at 11, Docket No. 15), has little impact on the Court's analysis.  The Board has not issued a complaint because it is waiting for Fortune Bay to provide documents pursuant to the subpoena that may establish its jurisdiction to do so.

Further, the Court concludes that the underlying proceeding is a proceeding by the United States, through the Board, and sovereign immunity does not bar this action.  In a prosecution under the NLRA, the Board's General Counsel is responsible for enforcing the public interest, not for enforcing the rights of private litigants.  *Vaca v. Sipes*, 386 U.S. 171, 182-83 & n.8 (1967); *Philip Carey Mfg. Co. v. N.L.R.B.*, 331 F.2d 720, 734 (6th Cir. 1964) ("The General Counsel, like the Board, is charged with the responsibility of representing the public interest, not that of private litigants.").  "[J]ust as a state may not assert sovereign immunity as against the federal government, neither may an Indian tribe, as a dependent nation, do so."  *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382-83 (8th Cir. 1987) (citation omitted).

Fortune Bay notes that the Supreme Court in *Federal Maritime Commission v. South Carolina State Ports Authority* – a suit brought by a private party – distinguished between cases brought **by** a federal agency and cases brought **before** a federal agency. 535 U.S. 743, 760 (2002).  That distinction, however, is of little import in this case.  The Board, a federal agency, issued the subpoena, just as it brought the enforcement proceeding in this Court.  Indeed, Fortune Bay concedes that "it is not immune from this instant enforcement proceeding because it was brought by the Board as an agent of the

United States." (Response to Order to Show Cause at 9, Docket No. 7.) The Court is not persuaded that Fortune Bay is nonetheless immune from responding to the subpoena, which was issued by the Board, merely because the Union, a private party, filed charges with the Board.

In sum, the Magistrate Judge did not err in concluding that the Board had jurisdiction to issue a subpoena in these circumstances. Accordingly, the Court adopts the Report and Recommendation as clarified by the above reasoning and grants the Board's application for an order enforcing the subpoena duces tecum.[5]

## ORDER

Based on the foregoing and the records, files, and proceedings herein, the Court **OVERRULES** respondent Fortune Bay Resort Casino's objections [Docket No. 15] and **ADOPTS** the Report and Recommendation of the Magistrate Judge dated June 1, 2009, [Docket No. 14] as discussed in this Memorandum Opinion. Accordingly, **IT IS HEREBY ORDERED** that:

1.     The Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum (Docket No. 1) is **GRANTED**.

2.     Fortune Bay is ordered to appear before an agent of the Board at a time, date, and location to be set by the Board; to produce the subpoenaed documents; and to testify and answer any and all questions relevant to the matters in question in the proceedings before the Board.

---

[5] The Court expects that the filing of this Order will resolve the issues relating to Fortune Bay's motion for summary judgment, (Docket No. 17), and the Board's motion to dismiss.

3. Fortune Bay's Motion for Summary Judgment [Docket No. 17] is **DENIED as moot**.

**IT IS HEREBY FURTHER ORDERED** that:

4. The Board's Motion for Voluntary Dismissal Without a Hearing [Docket No. 24] is **DENIED as moot**.[6]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 25, 2010          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                       United States District Judge

---

[6] On January 15, 2010, the Board filed a motion for voluntary dismissal of the enforcement action without prejudice, stating that it had reviewed "additional facts gathered by [the Board] in the intervening months since this petition was filed . . . and [those facts] are considered sufficient for the Board's General Counsel to determine whether an administrative complaint could issue." (Docket No. 26 at 2.) As a consequence, the Board contends that the "case has become moot and that a Court ruling either enforcing or refusing to enforce the NLRB subpoena will not materially affect the rights of either party." (*Id.* at 2.)

The Court may grant a plaintiff's request for voluntary dismissal "on terms that it considers proper." Fed. R. Civ. P. 41(a)(2). "[A] dismissal pursuant to Rule 41(a)(2) is not one of right but is rather a matter for the discretion of the trial court." *Great Rivers Coop. of SE Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 689 (8th Cir. 1999) (internal quotation marks omitted). Here, the Board asks that the Court dismiss the action without prejudice. However, should the Board ultimately determine that it has insufficient facts to bring an unfair labor practices complaint against Fortune Bay, the Board would not be barred from bringing a new enforcement action in this Court. Dismissing the case without prejudice would thus permit the Board to file duplicative future enforcement actions relating to the same circumstances discussed *supra. See Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999) (stating that when the Court reviews a motion for voluntary dismissal, the Court considers, *inter alia*, "whether the party has presented a proper explanation for its desire to dismiss; whether a dismissal would result in a waste of judicial time and effort; and whether a dismissal will prejudice the defendants" (citations omitted)). Accordingly, although the Court denies the Board's motion as moot, in these circumstances the Court would also exercise its discretion to deny the Board's motion on the merits.